Filed 9/25/15  In re A.F. CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| In re A.F., a Person Coming Under the Juvenile Court Law. | |
| KERN COUNTY DEPARTMENT OF HUMAN SERVICES,<br><br>        Plaintiff and Respondent,<br><br>                v.<br><br>T.F.,<br><br>        Defendant and Appellant. | F071180<br><br>(Super. Ct. No. JD129223-00)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Kern County.  Louie L. Vega, Judge.

Law Office of Marissa Coffey, Marissa Coffey, under appointment by the Court of Appeal, for Defendant and Appellant.

Theresa A. Goldner, County Counsel, and Jennifer E. Feige, Deputy County Counsel, for Plaintiff and Respondent.

-ooOoo-

## *INTRODUCTION*

Prior to a hearing pursuant to Welfare and Institutions Code[1] section 366.26, the Kern County Department of Human Services (department) recommended a permanent plan of legal guardianship over then eight-year-old A.F. by her caregivers, J.T. and D.T. The department did not recommend adoption as it was concerned with the commitment by D.T. to an adoption of A.F.

At a hearing held January 21, 2015, despite the department's recommendation of guardianship, the juvenile court terminated T.F.'s (mother) parental rights finding that, although A.F. was not generally adoptable, she was specifically adoptable by J.T. and D.T.

On appeal, mother complains the juvenile court's finding that A.F. is adoptable is not supported by substantial evidence. Specifically, she contends the department's determination that A.F. was neither generally nor specifically adoptable was ultimately a recommendation for legal guardianship, and, hence, the only relevant evidence in support of the adoptability finding was A.F.'s "tainted" testimony and that of D.T., the purported cause of the taint to A.F.'s testimony. Mother asserts legal guardianship is the most appropriate permanent plan in light of the little credible evidence that A.F. was specifically adoptable and because J.T. and D.T. are not suitable prospective adoptive parents.

In response to mother's appeal, department filed a letter with this court indicating that it "is in agreement with the position expressed in the Opening Brief," that "Kern County Court erred in terminating parental rights." It further advised it would not be filing a respondent's brief.

---

[1]Subsequent statutory references are to the Welfare and Institutions Code unless otherwise noted.

We find substantial evidence in support of the juvenile court's decision and affirm the order.

## *FACTS AND PROCEDURAL HISTORY*[2]

In August 2012, A.F. came to the attention of department when mother was found in possession of suspected narcotics and paraphernalia. The juvenile dependency petition alleged a failure to protect and no provision for support due to incarceration.

Following the detention hearing on August 28, 2012, A.F. was placed with her maternal grandmother. At disposition, the petition was sustained and family reunification services were ordered for mother. Eventually, A.F. was placed with mother's aunt D.T. and D.T.'s husband J.T. (collectively "caretakers") in July 2013, after maternal grandmother indicated she was unable to provide long-term care for A.F. and the caretakers were willing to accept placement.

In a social study dated October 11, 2013, it was noted that the caretakers were willing to commit to the adoption of A.F. Meanwhile, mother completed parenting and neglect counseling but was struggling with regard to substance-abuse issues. Visitation between mother and A.F. was "of adequate quality." In the January 6, 2014, social study, it was noted that mother had not yet completed substance-abuse counseling and had submitted only one drug test. Despite more than 12 months of family reunification services, mother had made minimal progress. The department recommended terminating services and setting the matter for a permanency planning hearing.

On February 3, 2014, the court terminated family reunification services for mother and set the matter for a section 366.26 hearing to be held in June 2014.

Intervening social studies documented instances wherein D.T. requested the department pick up A.F. from her home in order that she be placed elsewhere. This

---

**[2]**We omit references to father as he has taken no part in this appeal. Our recitation is focused on the facts and procedures relevant to the specific issues on appeal.

occurred when D.T. became frustrated or angry at the department and/or over mother's modifications to the visitation schedule.

Following a number of continuances, on January 20 and 21, 2015, the court ultimately heard testimony and argument on the issue of parental termination and the permanent plan for A.F. Despite the department's recommendation of legal guardianship to the caretakers, the court found A.F. to be specifically adoptable by the caretakers. Mother's parental rights were terminated, and the child was referred to the county adoption agency for adoptive placement.

On March 11, 2015, mother filed a notice of appeal.

## *DISCUSSION*

Mother contends the juvenile court's finding that A.F. was adoptable is not supported by substantial evidence. Specifically, she finds fault in the court's departure from the department's recommendation for legal guardianship. Further, she alleges A.F.'s testimony was tainted by her caretaker, making the evidence insufficient to support a finding of specific adoptability. Finally, mother claims legal guardianship was the most appropriate permanent plan due to the aforementioned insufficient evidence and because the caretakers were not suitable prospective adoptive parents.

In response to mother's opening brief, the department advised this court on or about June 8, 2015, that it "is in agreement with the position expressed" in mother's brief and further, that it would not be filing its own brief.

With this in mind, we respond to mother's assertions, after setting forth the entirety of the juvenile court's holding following the section 366.26 proceedings.

### *Juvenile court's ruling*

After impassioned arguments by all parties, the juvenile court ruled as follows:

" … All right. Obviously this is a difficult case. We have a child who has been in a current placement for the past year and a half. I've not seen in the reports any abuse of the child other than [that] which was characterized by mother's counsel as some form of apparent abuse when

4.

the caretakers had made demands or ultimatums. We have a mother who has significant drug problems. She's gone through the program and as recently as six months ago was still using, according to her own testimony. This is after this matter has been set for a permanency hearing under a two six.

"We have in the reports that the child is doing well in her school. She's positive. I've not heard anything negative about the relationship between the child and the caretakers other than what I've just referenced and what was made aptly clear by counsel.

"The caretakers have known the mother since she was three years old. So it's not—we're not dealing with strangers here. We are dealing with family.

"We have this child who is now approaching nine years of age. She's been in the prospective adoptive home, if that's—and that's how I'm going to characterize it. And they are committed to adoption. And, yes, she is not generally adoptable at least under the criteria that we've come to be familiar with. There's no legal impediment, as far as the court is aware of, to this child being adopted.

"I understand that guardianship would maintain parental rights. Frankly, if we were to contemplate every—how every adoption was gonna turn out, we would have a significant problem having to project what was gonna happen in each of the adoptions we perform weekly or I should— every other week I should say.

"I think it's in this child's best interest that she have a permanent home and that there be no question hanging over what her future is going to be as far as her familial relationships are concerned. I think the evidence presented here is that a permanent placement for her would be as an adoptive child of this—of the current caretakers. So that is what the court is finding from the child's testimony. I'm satisfied that she was speaking her mind. She is a child, and it's—I'm not saying I'm giving preference to her, because she's not of the age where we can give that preference. But, certainly, what she testified to I think was—I think her testimony was credible. I'm certainly subject to the—review by others if they choose. But we have to make those determinations with anyone who testifies. And she understood the responsibility of being truthful. I believe the caretaker who testified was sincere in her testimony as well. And, of course, mother I think is certainly sincere in her beliefs. We want what's best for this child. Permanency is what's best. And having a home that she does not have to question about its future I think is in her best interest.

"And so the court's going to make some other findings at this time. [¶] … [¶]

"All right. At this time, the court has considered the evidence presented, the testimony of the mother, the caretaker, and child and several reports going back to May 20th of 2014, July 24th, July 30th, September 24th, November 6, 2014, January 15th. I also have the CASA [Court Appointed Special Advocate] reports of November [3d] and the most recent report of January 16th. [¶] … [¶]

"The court is at this time finding that this child is adoptable. She's been in the current placement for the last 18 months. The court has not been presented with any legal impediment as to why the adoptive or pre-adoptive placement should not—is not appropriate.

"The current caretakers, who would be the adoptive parents, have been committed to this—and I'm not going to say it's unwavering, as they've expressed their frustration with the court—but the court does not find that that over—outweighs the finding it's making.

"The [department] has complied with the case plan by making reasonable efforts to complete whatever steps are necessary to finalize the permanent placement of the child. The educational, physical, mental and developmental needs of the child have been identified and are being met.

"And, at this time, the court finds there's clear and convincing evidence the child is likely to be adopted. Parental rights of the mother … [and the father] are ordered terminated. The child's declared free from parental care and control. The child is referred to the county adoption agency for adoptive placement of that child by the agency."

### *The applicable law*

"Once [the juvenile court] sets a hearing pursuant to section 366.26 to select and implement a permanent plan for a dependent child, the [agency] must prepare an assessment [citations], frequently referred to as an adoption assessment. Such an adoption assessment provides the information necessary for the juvenile court to determine whether it is likely the child will be adopted [citation] .…" (*In re G.M.* (2010) 181 Cal.App.4th 552, 559.) The assessment must include "[a] preliminary assessment of the eligibility and commitment of any identified prospective adoptive parent .…"

6.

(§ 366.21, subd. (i)(1)(D).) "A child's current caretaker may be designated as a prospective adoptive parent if the child has lived with the caretaker for at least six months, the caretaker currently expresses a commitment to adopt the child, and the caretaker has taken at least one step to facilitate the adoption process. (§ 366.26, subd. (n)(1).)" (*G.M., supra*, at p. 559.)

In order to terminate parental rights, the juvenile court must find by clear and convincing evidence that the child is likely to be adopted. (§ 366.26, subd. (c)(1).) The statute requires "clear and convincing evidence of the likelihood that adoption will be realized within a reasonable time." (*In re Zeth S*. (2003) 31 Cal.4th 396, 406.)

In determining adoptability, a juvenile court assesses the child's age, physical condition, and emotional state and how these characteristics affect a prospective parent's willingness to adopt the child. (*In re Sarah M*. (1994) 22 Cal.App.4th 1642, 1649.) "To be considered adoptable, a [child] need not be in a prospective adoptive home and there need not be a prospective adoptive parent '"waiting in the wings."' [Citation.] Nevertheless, 'the fact that a prospective adoptive parent has expressed interest in adopting the [child] is evidence that the [child's] age, physical condition, mental state, and other matters relating to the child are not likely to dissuade individuals from adopting the [child]. In other words, a prospective adoptive parent's willingness to adopt generally indicates the minor is likely to be adopted within a reasonable time either by the prospective adoptive parent *or by some other family*.' [Citation.]" (*In re R.C*. (2008) 169 Cal.App.4th 486, 491 (*R.C*.).)

In assessing adoptability, courts have divided children into two categories: those who are "generally adoptable" and those who are "specifically adoptable." A child is "generally adoptable" if the child's traits, e.g., age, physical condition, mental state, and other relevant factors, do not make it difficult to find an adoptive parent. A child is "specifically adoptable" if the child is adoptable only because of a specific caregiver's willingness to adopt. (*R.C., supra*, 169 Cal.App.4th at pp. 492-494.) "'When a child is

7.

deemed adoptable *only* because a particular caregiver is willing to adopt, the analysis shifts from evaluating the characteristics of the child to whether there is any legal impediment to the prospective adoptive parent's adoption and whether he or she is able to meet the needs of the child.'" (*Id.* at p. 494.)

On appeal, we review for substantial evidence the juvenile court's finding that a child is adoptable. (*R.C., supra*, 169 Cal.App.4th at pp. 486, 491.) "[O]ur task is to determine whether there is substantial evidence from which a reasonable trier of fact could find, by clear and convincing evidence, that the minor is adoptable. [Citation.] The appellant has the burden of showing there is no evidence of a sufficiently substantial nature to support the finding or order." (*Id*. at p. 491.) We give the court's adoptability finding the benefit of every reasonable inference and resolve any evidentiary conflicts in favor of the judgment of the juvenile court. (*In re Autumn H*. (1994) 27 Cal.App.4th 567, 576.)

*Our analysis*

Mother begins by inferring that the juvenile court must agree with the department's adoption assessment because she contends a court "must make its clear and convincing finding based on the [d]epartment's adoption assessment *and* other relevant evidence, not the [d]epartment's adoption assessment *or* other relevant evidence."

Section 366.26, subdivision (c)(1), provides, in relevant part:

> "If the court determines, based on the assessment provided as ordered under subdivision (i) of Section 366.21, subdivision (b) of Section 366.22, or subdivision (b) of Section 366.25, and any other relevant evidence, by a clear and convincing standard, that it is likely the child will be adopted, the court shall terminate parental rights and order the child placed for adoption."

Here, the court did in fact base its determination on the department's adoption assessment and the testimony proffered at the proceedings held on January 20 and 21, 2015. However, it departed from what is certainly the norm when the court did not agree

8.

with the department that legal guardianship was the preferred placement option for A.F. Despite the arguments asserted by counsel for mother and the department, the court was not troubled by the actions taken by the caretakers as it pertained to their purported vacillation between legal guardianship and adoption: "I've not seen in the reports any abuse of the child other than [that] which was characterized by mother's counsel as some form of apparent abuse when the caretakers had made demands or ultimatums." And, "I've not heard anything negative about the relationship between the child and the caretakers other than what I've just referenced and what was made aptly clear by counsel." Moreover, the court expressly identified the evidence it considered: "[T]he court has considered the evidence presented, the testimony of the mother, the caretaker, and child and several reports going back to May 20th of 2014, July 24th, July 30th, September 24th, November 6, 2014, January 15th. [The court has also read] the CASA reports of November [3d] and the most recent report of January 16th." That documentation includes the information mother characterizes as ignored by the court.

The statute does not require that the court adopt the department's assessment as its own. Neither has mother provided any legal authority in support of that proposition. We note there is a difference between a court considering an assessment report before concluding differently than the recommendation offered by the department, versus a court proceeding in the absence of any assessment or failing to consider an available assessment altogether. The former does not require reversal, assuming it is supported by substantial evidence. Simply put, it is the court's decision to make, rather than the department's.

The record and evidence here are distinguishable from that in *In re Brian P.* (2002) 99 Cal.App.4th 616, upon which mother relies. In *Brian P.*, the court did not have an adoption assessment report that included facts about Brian. Further, the record revealed ambiguities regarding Brian's physical, developmental, and emotional states. (*Id*. at pp. 624-625.) Unlike *Brian P.*, the court here had several CASA reports and over

9.

a dozen social studies and supplemental social studies, a number of which referred to A.F. in detail, as well as to the caretakers' desire for adoption over guardianship, and considerations related thereto.

With regard to the court's finding that A.F. was specifically adoptable, mother contends it is unclear whether there was a legal impediment to the caretakers' adoption of A.F. because the department "did not recommend adoption." As we stated in *In re G.M., supra*, 181 Cal.App.4th at page 561, "whether a legal impediment under Family Code sections 8601, 8602, or 8603 exists to a prospective adoptive parent's eligibility to adoption is a relevant issue when the likelihood of a child's adoption is 'based solely' on the existence of the prospective adoptive parent."[3] Here, the juvenile court clearly understood it was required to find no legal impediment to adoption by the caretakers and whether or not they are able to meet A.F.'s needs. It expressly found there was "no legal impediment" to A.F.'s adoption by the caretakers and noted the caretakers were able to meet A.F.'s needs. The record itself reveals the caretakers are more than 10 years older than A.F.; A.F.'s consent to the adoption was not required because she was then eight years old, although she did express her desire to be adopted; and D.T. testified that her spouse J.T. (who was present during her testimony) also wished to adopt A.F.

Mother asserts that the juvenile court "failed to acknowledge" how the caretaker placed A.F. "squarely in the middle of a power struggle" between mother and the department and that the court "failed to address how the unjust influence" of the caretaker placed on A.F. "posed a serious emotional detriment to [A.F.] that would be further perpetuated through adoption." Her assertions are not well taken. The juvenile court was

---

[3]Family Code section 8601 provides, in relevant part, that "a prospective adoptive parent or parents shall be at least 10 years older than the child." Family Code section 8602 holds that, where the child is "over the age of 12 years," his or her consent to the adoption "is necessary." Lastly, the relevant subdivision of Family Code section 8603 pertains to the requirement that a married person may not adopt a child "without the consent of" his or her spouse.

plainly aware of the frustrations realized by all parties in this matter. It stated as much as it announced its ruling: "Obviously this is a difficult case." The court simply was not persuaded by the arguments proffered in opposition to adoption. Our review of the record reveals that the court's determination was both careful and thorough.

It is significant to note that, during the relevant hearing on this matter, A.F. testified that she wanted to be adopted by her caretakers. She also testified that D.T. did not put words in her mouth; she wished to be adopted. As we review the record, the juvenile court did not give preference to A.F.'s testimony; rather, this evidence was considered as part of the greater whole. Additionally, D.T. testified and explained that on a few occasions she has become "extremely frustrated" with the department's social workers, but that she has always wanted to adopt A.F. and loved her as her own daughter.

Mother's complaints here amount to evidentiary conflicts, as there is evidence to support her position and the court's decision. But, we resolve any such conflicts in favor of the judgment of the juvenile court. (*In re Autumn H., supra*, 27 Cal.App.4th at p. 576.) Further, we find its inferences to be reasonable. (*Ibid*.)

Next, arguing that legal guardianship of A.F. by the caretakers was the most appropriate plan, mother relies upon *In re Scott B*. (2010) 188 Cal.App.4th 452. However, we are not persuaded. Briefly stated, in *Scott B*., the 11-year-old autistic child lived in a foster home with a woman willing to adopt him. However, Scott and his biological mother had a very close relationship, and Scott did not want to be adopted if it meant he would not see his mother again. (*Id*. at pp. 454-468.) Here, however, A.F. expressed a desire to be adopted by J.T. and D.T., and she testified similarly. A.F. began to refuse to see her mother during scheduled visitations and testified that she did not want to see or live with her mother. The record does reveal that mother and A.F's visits were pleasant; however, their relationship was never characterized as "exceptionally close." We simply do not see the comparisons between the *Scott B*. case and the instant case, despite mother's assertions.

As part of her argument that legal guardianship was the preferred permanent plan, mother contends the court made "no mention of a completed [home study]" prepared by the department that addressed a 2008 child welfare report involving J.T., as well as the caretakers' renter's criminal past. Mother's statement is not accurate as the juvenile court referenced the supplemental social study dated September 24, 2014, in pronouncing its decision. That document provides the following information:

**"ASSESSMENT OF PROSPECTIVE ADOPTIVE FAMILY/LEGAL GUARDIANS**

"CHARACTERISTICS OF PROSPECTIVE ADOPTIVE PARENT(S)/GUARDIANS:

"[A.F.] has lived with the prospective legal guardians since July 6, 2013. The prospective legal guardians are [A.F.]'s maternal great aunt and uncle. The prospective legal guardians have lived in their current home for almost six years. The home of the prospective legal guardians is comfortably furnished and has three bedrooms and two bathrooms. Also living in the home is another renter, who has no relation to either of the prospective legal guardians. The prospective legal guardians have been married for fifteen and a half years. The maternal great aunt has a twelfth grade education and works as a house keeper and a dog breeder. The maternal great uncle has a twelfth grade education and is the operations superintendent for a production services company. The prospective legal guardians report being in good health and are not on any medications. The income of the family is approximately $150,000 annually, which does not include foster care.

"RESULTS OF CRIMINAL HISTORY CLEARANCE:

"A criminal clearance through the Criminal Justice Information System (CJIS), was completed on September 19, 2014 on the prospective legal guardians and the renter in their home. There were no results found on the prospective legal guardians. The renter in the home has a possession of a controlled substance and a driving [under] the influence charge from July 21, 2000. He also has a driving under the influence charge from July 21, 1988, a drunk driving on the highway from March 27, 1981, and a vandalism charge from June 4, 1980. A criminal exemption was completed by relative assessment.

"RESULTS OF CHILD PROTECTIVE SERVICES CLEARANCE:

"A Child Protective Services Clearance was completed on September 16, 2014 and a Child Welfare Services/Case Management Systems Clearance was completed on September 19, 2014 on the prospective legal guardians and their live in renter. There were no results found on the maternal great aunt or the live in renter. The maternal great uncle has a referral from June 2, 2008, with allegations of emotional abuse and caretaker absence/incapacity which were unfounded. There is also a physical abuse allegation, which was inconclusive. The child reported that his father pushed him to the ground, grabbed him by the hair, and hit him in the head with a closed fist. There were no injuries to the child; however, the father admitted to pushing the child down, due to the child being in a fighting stance and he thought he was going to hit him. He said that he did not hit him with a closed fist, grab his hair, or hit the child in any manner."

This matter is unlike *In re Jerome D*. (2000) 84 Cal.App.4th 1200. There, the assessment or home study was incomplete and lacked any information as to the prospective adopter's criminal and child welfare history. (*Id*. at p. 1205.) Here, the court did not lack any information concerning the relevant criminal and welfare histories; as excerpted above, the court was informed. We find it reasonable to infer that the court noted the 2008 incident involving J.T. was found to be "inconclusive" and "unfounded." And the renter's most recent brush with the law had occurred nearly 15 years earlier.

As we stated in *In re A.A*. (2008) 167 Cal.App.4th 1292, 1313:

"[A]ppellants approach the question of the children's adoptability by picking and choosing evidence from the record in support of their argument. This is not an approach we may follow on review. The power of an appellate court asked to assess the sufficiency of the evidence begins and ends with a determination of whether there is any substantial evidence, whether or not contradicted, which will support the conclusion of the trier of fact. [Citation.] All conflicts must be resolved in favor of the respondent and all legitimate inferences indulged in to uphold the decision, if possible. We may not reweigh or express an independent judgment on the evidence. [Citation.]"

In sum, our review reveals substantial, albeit contradicted, evidence to support the juvenile court as finder of fact. We have not reweighed the evidence. We have resolved

13.

all conflicts in favor of upholding the court's decision, for its inferences were reasonable and legitimate.

### ***DISPOSITION***

The order terminating mother's parental rights is affirmed.

_____
Smith, J.

WE CONCUR:

_____
Detjen, Acting P. J.

_____
Peña, J.